Defendant corporation appeals from a verdict and judgment in favor of plaintiff and from the denial of judgment n.o.v. or alternatively for new trial. The Circuit Court for the Tenth Judicial Circuit, Jefferson County, sitting with a jury, rendered a $5,500 judgment in plaintiff's favor based on defendant's wrongful detention for eighteen to twenty days of plaintiff's automobile and certain items of personal property therein. We affirm.
This appeal arises out of the following facts. On or about May 17, 1976 plaintiff Seibold came to defendant Richard Kelley Chevrolet's place of business, an automobile dealership in Jefferson County, for the purpose of looking at used automobiles. One of the dealership's salesmen, Richard L. Harmon, met and worked with plaintiff on *Page 991 
that evening. Plaintiff became interested in one particular 1974 Pontiac on defendant's lot, and discussed with the salesman the possibility of a trade whereby plaintiff would give his then-present vehicle, a 1973 Chevrolet, plus cash in exchange for the 1974 Pontiac.
During the negotiations for the trade, defendant's salesman produced a document entitled "Retail Offer for a Motor Vehicle." As plaintiff and salesman calculated the amount of cash plaintiff was willing to give in addition to his trade-in, a proposed amount would be written down on the document, and the salesman alone would advise the dealership's sales manager, Olin Bryant, of the proposed amount. If the figure was not acceptable to the sales manager, he would "x" out the figure and the salesman would return to negotiate further with plaintiff. Over the course of one to two hours, numerous attempts were made to arrive at a mutually satisfactory amount. Eventually a final figure was agreed upon. Both plaintiff and the sales manager initialed that figure.
The document identifies the automobiles involved in the trade, lists plaintiff's name and address, itemizes the various components of the total sales price, and states in pertinent part:
 Purchaser by his execution of this order agrees to purchase the described motor vehicle from Richard Kelley Chevrolet, Inc. at the price indicated hereon . . . This offer shall not become binding until accepted by dealer or his authorized representative.
Immediately below this quoted portion are spaces for two signatures; one space styled "Purchaser's signature," which was signed by plaintiff that evening, and the other space, styled "Accepted by," containing sales manager Olin Bryant's signature.
As was customary for that dealership, the salesman asked for a $100 deposit on the car, but plaintiff had only $25 at the time and left that amount as the deposit. Plaintiff refused the salesman's request to leave his Chevrolet at the dealership that night and use one of the dealership's demonstrators until plaintiff took delivery of the Pontiac. Plaintiff stated that some of his personal property was still in his car and that he could not leave his car that night. These personal items in plaintiff's car were plaintiff's $400 paycheck, a suit, two pairs of shoes, sunglasses, and miscellaneous business papers.
The record indicates that both plaintiff and salesman understood that the trade was contingent on plaintiff's obtaining financing from his bank. However, the document signed by plaintiff mentioned neither this contingency nor the deposit requirement.
The next meeting between the salesman and plaintiff occurred the next morning, May 18, when the salesman visited plaintiff's place of employment. At that time the salesman left plaintiff the keys to a demonstrator and drove plaintiff's Chevrolet, with the personal items still in the car, back to the dealership. Plaintiff was to contact his bank about the financing of the trade, and then come back down to the dealership that afternoon. When plaintiff did not show up that afternoon as expected, the salesman contacted plaintiff's bank and was told that there was no problem with plaintiff's credit.
Meanwhile plaintiff, having learned from his bank the amount of monthly payments that would be required to consummate the trade with defendant, decided not to buy the 1974 Pontiac because the payments were too high. Thereupon plaintiff drove the demonstrator to another car dealership, Parkway Auto Sales, to look for another used car.
Plaintiff asked a Parkway employee, John Parker, to go to defendant's dealership and pick up plaintiff's Chevrolet. Parker failed in his attempt to do so, being told by defendant's sales manager, Olin Bryant, that plaintiff had already traded with Richard Kelley Chevrolet.
Plaintiff himself went to defendant's dealership and repeatedly requested that his car be returned to him. Defendant's sales manager on duty at the time, Bob *Page 992 
Reed, told plaintiff that, as far as the dealership was concerned, the trade had already been made, and that "plaintiff's car" was outside, pointing to the 1974 Pontiac. The sales manager also told plaintiff that he would be glad to discuss any problem that may have arisen concerning the trade.
After plaintiff's requests for return of his Chevrolet had been denied, plaintiff left the premises of defendant's dealership. During the next few days plaintiff purchased a used car from Parkway Auto Sales.
Plaintiff filed suit against Richard Kelley Chevrolet, Inc., sales manager Olin Bryant, and salesman Richard Harmon, claiming compensatory and punitive damages for the conversion of his Chevrolet and the personal property therein. On or about June 4, 1976 defendants returned possession of the car and personal items to plaintiff, having detained this property for eighteen to twenty days.
Plaintiff's testimony indicated that during the initial negotiations for the trade, plaintiff told the salesman that he could not bind himself to a deal that evening because he had not yet made arrangements with his bank for financing the trade, but that if he decided he wanted the car or if he thought he was interested, he would call the salesman. Plaintiff testified that the salesman had reassured him that his signature on the "Retail Offer" document would not commit him to the proposed trade, nor would his signature authorize defendant to "take his car," and that plaintiff "had to sign it before the offer could even be approved." The salesman agreed that the document "doesn't mean anything, except we're getting around to an agreement on a price," and that plaintiff's $25 deposit would be returned if plaintiff decided not to take the car.
Plaintiff testified that the salesman attempted to get him to fill out some other document that evening, apparently a GMAC contract or something similar, but plaintiff told him, "I didn't want to, didn't have time, I needed to get home. So, I left. . . ."
Plaintiff further testified that the next day when the salesman came to plaintiff's place of employment, the salesman represented to him that plaintiff's Chevrolet was being taken in for appraisal as to its trade-in value. No statements were made by either to indicate that the proposed trade had already been consummated. Plaintiff also testified that after defendant's denial of his request to get his Chevrolet back, defendant also refused to allow him to retrieve his personal property from that car. Plaintiff conceded that he was never treated rudely or discourteously by defendant.
Plaintiff testified that defendant's conduct damaged him in several ways. The deprivation of his car for twenty days required him to borrow cars from various persons, and soon required him to buy another car "at whatever price I had to buy it at" in order to commute back and forth from his home in Guntersville to his job in Birmingham. He also had to continue to make payments to his bank on the car in defendant's possession. The deprivation of his paycheck caused him to go without a paycheck for a month, and required him to borrow money from friends and relatives. He also was deprived of the use of the other items in the car.
Testimony adduced on behalf of defendant tended to show that defendant took possession of and retained plaintiff's car pursuant to a mutually-binding contract. Plaintiff voluntarily gave up possession of the Chevrolet to the salesman who made no representations to him that the car was being taken in for appraisal. The demonstrator, rather than the 1974 Pontiac, was left with plaintiff at that time because the agreed-upon cash payment had not yet been tendered by plaintiff. The salesman testified that "until an automobile or vehicle is paid for there can be no sale."
The salesman further testified that when plaintiff demanded return of his car, he gave no explanation as to why he would not go through with the trade. Nor did plaintiff ever request that he be allowed to retrieve the personal property in the car. Defendant concedes that the paycheck, suit, *Page 993 
etc. formed no part of the consideration for the trade. Defendant became aware of the presence of the personal items in the car on May 18, after the salesman had brought plaintiff's Chevrolet back to the dealership.
The judgment, based on the jury verdict, was rendered in favor of plaintiff and against defendant Richard Kelley Chevrolet Company, Inc. only, and assessed plaintiff's damages at $5,500. Defendant appeals from this judgment and from the denial of defendant's motion for judgment n.o.v. or in the alternative for a new trial.
Defendant's basic contention on appeal is that its detention of plaintiff's car was justified by the valid, mutually-binding contract (i.e. the "Retail Offer" document). Its lawful possession of the Chevrolet pursuant to that contract did not constitute a conversion. Defendant argues that the trial court erred in admitting parol testimony at trial to vary or contradict the terms of the written contract, and also erred in submitting to the jury the question of the existence vel non of the contract.
We note at the outset that defendant failed to object to the trial court's instructions to the jury before it retired to consider its verdict, and thus defendant is precluded from now raising this alleged error as cause for reversal. Lankford v.Redwing Carriers, Inc., Ala.Civ.App., 344 So.2d 515, cert. den.
Ala., 344 So.2d 522 (1977); Rule 51, ARCP.
The parol evidence rule is generally defined as follows:
 When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. (Footnote omitted.) 3 A. Corbin, Contracts, § 573, at 357 (1960).
Any application of the rule presupposes the existence of an existing, valid contract expressing the obligations of the parties. Sellers v. Dickert, 185 Ala. 206, 64 So. 40 (1913). In this action the crucial issue is not what terms are or are not included in the contract, but rather, whether an agreementexisted which justified defendant's retention of plaintiff's automobile.
On the issues of whether a contract is void, voidable or reformable because of illegality, fraud, mistake or any other reason and whether the parties assented to a particular writing as the complete and accurate integration of their contract, there is no parol evidence rule to be applied. On these issues no relevant evidence, parol or otherwise, is excluded. No written document is sufficient, standing alone, to determine any one of them, however long and detailed it may be. No one of these issues can be determined by mere inspection of the written document. See 3 A. Corbin, Contracts, § 573 at 360 (1960). Accord, Battery Steamship Corp. v. Refineria Panama,S.A., 513 F.2d 735 (2nd Cir. 1975).
Our case law is in accord with these principles. In AlabamaPower Co. v. Pierre, 236 Ala. 521, 183 So. 665 (1938) the supreme court affirmed the trial court's ruling allowing into evidence plaintiff's testimony of an oral agreement which contradicted a written agreement, where the written contract was signed by plaintiff who was invited not to read the contract and who was told that there was no "catch" in it. The court's opinion states that the parol agreement was admissible upon the theory that it clearly appears the parties never intended that the written contract should express their full agreement.
The Alabama Supreme Court has recently cited with approvalAlabama Power Co. v. Pierre, holding that parol evidence is admissible where there is doubt that a written agreement was intended to reflect the full agreement between the parties.I.H.M., Inc. v. Central Bank of Montgomery, Ala., 340 So.2d 30
(1976). There the court noted that the written document in question was clearly intended only as a memorandum of agreement and that the execution of a more formal document, containing all of the terms of the agreement, was contemplated by the parties. Under these circumstances, *Page 994 
the opinion states, it is perfectly permissible for the court to look to pre-contract negotiations and the conduct of the parties to determine what was meant by their agreement.
We think the principles discussed above are controlling in the case at bar. The testimony of defendant's salesman indicated that the "Retail Offer" document was subject to certain contingencies and conditions, one of which was plaintiff's obtaining financing for the trade. Plaintiff's testimony was that the salesman told him that his signature on the document would not bind him to the trade and that he could have his deposit returned to him should he decide not to go through with the trade. Plaintiff's refusal to sign the GMAC contract proffered by defendant's salesman could reasonably be viewed by the jury that the evening's discussions were merely non-binding preliminary negotiations, and that a more formal, binding contract was contemplated by the parties. See
Restatement 2d of Contracts, § 26 (1973).
Plaintiff's testimony, uncontradicted by that of defendant's salesman, tended to show that the salesman knew that plaintiff was unable to make a binding agreement on the evening of the initial negotiations. Section 25 of the Restatement 2d of Contracts (1973) provides in pertinent part:
Preliminary Negotiations
 A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.
The comments to that section provide in pertinent part:
 a. Interpretation of proposals for exchange. . . .
If the addressee of a proposal has reason to know that no offer is intended, there is no offer even though he understands it to be an offer. "Reason to know" depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties. . . .
. . . . .
 e. Written contract documents. A standard method of making an offer is to submit to the offeree a written agreement signed by the offeror and to invite the offeree to sign on a line provided for that purpose. . . . But the signature even in such a case is not
conclusive if the other party has reason to know that no offer is intended. . . . Reason to know that such is the intention may exist even though the document on its face seems to be clear and unambiguous. (Emphasis supplied)
The jury might reasonably have inferred from the evidence presented that plaintiff was not making an offer to the salesman, that the salesman knew or had reason to know this fact, and that a meeting of the minds, a sine qua non of a binding contract, was not present. Moreover, this record reveals that plaintiff's understanding of the initial negotiations was that defendant would make an offer to him, based on the "Retail Offer" document.
Our view in the case at bar is further supported by the opinion in Roan v. McCaleb, 264 Ala. 31, 84 So.2d 358 (1955). In that case plaintiff-buyer was to trade his Chevrolet and cash in exchange for a Ford from defendant-automobile dealer. The dealer asked plaintiff to sign a document which purportedly would provide insurance coverage for the Ford while plaintiff took possession of the Ford overnight to "try it out." The document, in fact, was a sales contract with blanks which were not then, nor ever, filled in. When plaintiff returned the car the next day, having decided not to trade cars, he found that the dealer had already disposed of his Chevrolet. In plaintiff's suit for conversion, the dealer contended that a firm trade had been made. The supreme court, in sustaining plaintiff's recovery, stated that defendant's contention that a firm trade had been made presented an issue for the jury.
In sum, we hold that the trial court properly admitted into evidence the parol testimony, and that submission to the jury of *Page 995 
the question of defendant's rights, if any, to the car under the "Retail Offer" document was not reversible error.
Defendant's next contention is that the jury verdict of $5,500 — an amount which obviously included punitive as well as compensatory damages — demonstrates bias, prejudice, and improper motive on the part of the jury and is excessive. Since there existed a valid contract between plaintiff and defendant, it is argued, defendant's detention of the automobile did not constitute the "knowing, intentional and wilful violation" of the law and of plaintiff's rights which would authorize the award of punitive damages. Likewise, no attendant circumstances of insult or malice were present in this case to warrant such damages. We disagree.
The jury might reasonably have concluded from the evidence that defendant, having no right to keep the car under the agreement between the parties, intentionally and willfully violated the law and plaintiff's rights by its actions. The intentional, willful and knowing violation of the law and of plaintiff's rights in and of itself is legal insult, contumely and malice, and would authorize the jury in its discretion to award punitive damages. Ray Hughes Chevrolet, Inc. v. Gordon,294 Ala. 638, 320 So.2d 652 (1975); Parker v. Sutton,47 Ala. App. 352, 254 So.2d 425, cert. den. 287 Ala. 738,254 So.2d 431 (1971). Nor are we able to agree with defendant that the verdict is excessive.
Defendant further argues that the trial court erred in failing to grant defendant's motion for a directed verdict. The basis for this contention is the trial court erred in allowing parol evidence to vary the terms of the written contract which contained no ambiguous terms. In view of the foregoing discussion, we are unable to agree with this contention. In reviewing refusal of affirmative charge for defendant, we must review the evidence in a light most favorable to plaintiff and affirm the trial court's action if there is a scintilla of evidence to support the complaint. Ramos v. Fell, 272 Ala. 53,128 So.2d 481 (1961); ARCP 51. We believe there was at least a scintilla of evidence to support plaintiff's claim, and that the trial court properly overruled defendant's motion for directed verdict.
Defendant also assigned other grounds for its motion for new trial, but failed to argue these in brief. Therefore, we do not reach these arguments.
A motion for new trial is properly overruled when there is credible evidence which justifies the verdict. W.T. Ratliff Co.v. Purvis, 292 Ala. 171, 291 So.2d 289 (1974). We think the record reveals sufficient evidence to support the jury's verdict. There being no reversible error, this case is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur.